# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASTRA VEDA CORPORATION, *f/k/a* WORLDFLIX, INC., | CIVIL ACTION NO. _____ |
| Plaintiff, | COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| BLACKBRIDGE CAPITAL, LLC, ALEXANDER DILLON, and COSMIN PANAIT, | |
| Defendants. | |

Plaintiff Astra Veda Corporation, through counsel, states for its Complaint against Defendants Blackbridge Capital, LLC, Alexander Dillon, and Cosmin Panait[1] as follows.

## NATURE OF THE ACTION

1.      Blackbridge is a "death spiral" or "toxic" lender:[2] an unregistered securities dealer that engages in convertible market adjustable securities transactions with small public companies—businesses that are often struggling to raise capital.  Toxic lenders like Blackbridge are not the saviors of microcaps that they purport to be, nor is their business model legal; they are unregistered dealers and, often, as in this case, criminal usurers.

2.      As reflected in recent Securities and Exchange Commission ("SEC") prosecutions,[3]

---

[1]  The following terms are used herein:  Astra Veda Corporation ("Plaintiff" or "Astra Veda"); Defendant Blackbridge Capital, LLC ("Defendant" or "Blackbridge"); Defendant Alexander Dillon ("Dillon"); and Cosmin Panait ("Panait"); Dillon and Panait, collectively, the "Blackbridge Managers;" and all Defendants, collectively, the "Defendants."

[2]  *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities (last accessed April 11, 2022); https://en.wikipedia.org/wiki/Death_spiral_financing (last accessed April 11, 2022).

[3]  *See, e.g., SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2022 U.S. Dist. LEXIS 11692, 2022 WL 196283 (S.D. Fla. Jan. 21, 2022); *SEC v. Fierro*, 2020 U.S. Dist. LEXIS 238936, 2020 WL 7481773 (D.N.J. 2020).

lenders like Blackbridge avoid registering so they can evade regulatory oversight and thereby make predatory loans that generate outrageous profits.

3.      The toxic lending business model is simple: unlike an investor or day trader, the lender uses the loan transaction to acquire the company's stock at a steep discount[4] (in addition to formal loan interest), which it then dumps into the public markets as soon as possible, invariably causing a catastrophic plunge in the stock price.

4.      Blackbridge's business model is illegal.  In recent civil actions, the SEC has sued toxic lenders that use Blackbridge's precise business model for unlawfully operating as unregistered securities dealers in violation of § 15(a) of the Securities Exchange Act of 1934 (the "Act") (15 U.S.C. § 78o).  Every court to address this issue has agreed with the SEC.[5]

5.      The Agreements in this case[6] are patently unlawful as they were made and subsequently performed in violation of Section 15(a) of the Act.  Plaintiff seeks rescission of the Agreements, rescissionary damages equal to the gross proceeds Defendants received from the sale of Plaintiff's stock (less the amounts advanced by Defendants to Plaintiff), attorneys' fees, and any and all other relief that the Court deems just, proper, and in the interest of justice.

---

[4]  The stock is generally obtained via one or more market-adjustable convertible debt products required by the lender for making the loan; this may be the convertible promissory note itself or a warrant.

[5]  *See*, *e.g.*, *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015); *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, No. 20-cv-21254, 2022 WL 196283 (S.D. Fla. Jan. 21., 2022); *SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife*, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021) (the "SEC cases").  For private civil actions seeking rescission based on failure to register, *see Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy*, 6 F.4th 50 (1st Cir. 2021), and *Auctus Fund, LLC v. Players Network, Inc.*, 20-cv-10766 (D. Mass. Dec. 10, 2021).

[6]  "Agreements" are defined as the documents executed by Plaintiff in favor of Blackbridge.  Specifically: on March 11, 2016, Blackbridge, and Astra Veda doing business as WorldFlix Inc., entered into a Convertible Promissory Note ("March 2016 Note"), under which Blackbridge purchased from Astra Veda a commitment fee in the amount of $200,000.00 bearing a 5% stated interest rate, and a Securities Purchase Agreement ("March 2016 SPA").  The March 2016 SPA contained Section 1.d, which created a Regulation A deadline. Section 1.d held that in the event that Astra Veda's Regulation A offering was not declared Effective by the SEC within twelve months, $175,000.00 of the principal amount of the March 2016 Note was to be extinguished leaving only $25,000.00 of the principal. On May 8, 2017, the parties executed an amendment to the March 2016 SPA ("March 2016 Amendment"), which removed the Regulation A deadline, thus entitling Blackbridge to the full balance of the principal.  A true and correct copy of the Note, SPA, and Amendment are attached as **Exhibit 1**.

6.      Blackbridge is an "enterprise" under the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962, *et seq.,* which engages in the collection of unlawful debts at the direction and control of the Blackbridge Managers.

7.      The loans created pursuant to the Agreements (the "Loans") are criminally usurious because they reserved and imposed charges in excess of the maximum enforceable rate of interest—25% per annum—allowed by New York state law.  *See* N.Y. Penal Law § 190.40.

8.      The Agreements reserved a stated interest rate of 5% per annum, a 20% discount at conversion, and default charges of 91.25%, resulting in a **121.25% A.P.R. total interest rate**.

9.      Accordingly, among other relief, Astra Veda seeks treble damages under RICO because the amount of interest charged by Blackbridge is more than double the maximum enforceable rate of interest allowed by New York law.

10.     Further, the equitable remedy of voiding and rescinding the Agreements provided under § 29(b) of the Act should be effectuated by, among other things, ordering Blackbridge to return to Astra Veda every share of stock it acquired under the Agreements, less the cash value of the net sum provided to Astra Veda for the purchase of the note.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Act.

12.     This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2).  Plaintiff is a citizen of Wyoming, Defendants Blackbridge and Panait are citizens of New York, Defendant Dillon is a citizen of New Jersey, and the amount in controversy exceeds $75,000.00.

13.     The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendant's principal place of business is located in this District and because a substantial part of the events giving rise to this action occurred in this District.

15.     Venue is also proper in this Court because the Agreements each expressly state that any action brought by either party concerning the transactions contemplated by the Agreements must be brought in New York state courts or in federal courts located in the State of New York.

## **PARTIES**

16.     Plaintiff is a Wyoming Corporation and with its principal place of business at 12361 East Cornell Avenue, Aurora, CO 80014.  Plaintiff is currently incorporated in Wyoming as of 2019.

17.     Defendant Blackbridge Capital, LLC is a Delaware limited liability company with its principal place of business at 450 7th Ave Suite 601, New York, NY 10123. Defendant is currently incorporated in Delaware as of 2012.

18.     Defendant Alexander Dillon is and was during the relevant time, a managing member of Blackbridge Capital, LLC.  Dillon resides at 79 Chestnut Avenue, Closter, New Jersey 07624.[7]

19.     Defendant Cosmin Panait is and was during the relevant time, a managing member of Blackbridge Capital, LLC.  Panait resides at 101 Wall Street #22A, New York, NY  10005.[8]

---

[7] Defendant Alexander Dillon is a named defendant in an SEC enforcement action pending in this district that alleges the same or substantially similar claims as alleged herein.  *See also SEC v. GPL Ventures LLC*, No. 21 Civ. 6814 (AKH), 2022 WL 158885 at *1 (S.D.N.Y. Jan. 18, 2022).
[8] Defendant Cosmin Panait is a named defendant in an SEC enforcement action pending in this district that alleges the same or substantially similar claims as alleged herein.  *See also SEC v. GPL Ventures LLC*, No. 21 Civ. 6814 (AKH), 2022 WL 158885 at *1 (S.D.N.Y. Jan. 18, 2022).

## FACTUAL ALLEGATIONS

### I.     BLACKBRIDGE CAPITAL, LLC.

20.     Through Dillon and Panait, Blackbridge exists for the purpose of lending money using the business model described herein.

21.     Upon information and belief, Dillon and Panait have authorized and directed Blackbridge to enter into numerous convertible promissory notes and other alternative securities transactions with numerous public companies also subject to New York law

22.     Upon information and belief, the interest rates being charged on these transactions often exceed the lawful amount permitted under New York law, the collection of which results in an ongoing business of unlawful debt collection.

23.     Upon information and belief, the interest rates being charged on these transactions often exceed twice the maximum enforceable rate permitted under New York law, the collection of which results in an ongoing business of unlawful debt collection in violation of RICO, 28 U.S.C. § 1962(c).

### II.     THE BLACKBRIDGE GENERAL BUSINESS MODEL

#### *The Defendants Target Financially-Strapped Issuers in Need of Capital*

24.     Upon information and belief, Defendants position themselves to take advantage of issuers' vulnerable financial conditions to negotiate highly favorable lending terms.

25.     Upon information and belief, Defendants obtain all of the stock directly from the public companies through note conversions and/or warrants, as opposed to purchasing shares in the open market (i.e., like a "trader").

26.     Because the shares that Defendants obtain are newly-issued, the subsequent dumping of the shares into the market significantly increases both the amount of shares in the

hands of the public and the issuers' outstanding share totals.  Selling into the public market large quantities of newly-issued shares obtained directly from issuers is a common hallmark of a securities dealer.

27.     In addition to reaping gains from the spread between the discount and the market price, upon information and belief, the Defendants negotiate to add consideration such as up-front stock, stock purchase warrants, and compensation for fees and costs.

***The Defendants Purchase Convertible***
***Promissory Notes with Favorable Terms***
***For the Purpose of Obtaining Shares of Stock***

28.     Upon information and belief, Defendants obtained all of the stock they sold as part of their business directly from public companies through note conversions, as opposed to purchases of stock in the open market, like a "trader."  The billions of shares that Defendants obtained through their transactions with public companies were newly-issued, and their later sales of those shares in the market significantly increased both the amount of shares in the hands of the 144 public and the issuers' outstanding share totals.  Selling into the public market large quantities of newly-issued shares obtained directly from issuers is a common hallmark of a securities dealer.

29.     In addition to profiting from the spread made available by Defendants' prompt sales following a conversion, the Defendants realize additional financial gains through additional negotiated terms, such as negotiation, preparation, execution, delivery and performance fees associated with the Agreement.  *See, **Exhibit 1**.,* March 2016 SPA at § 4c.

***Defendants Converted Promissory***
***Note Debt Into Newly Issued Shares of***
***Common Stock at a Substantial Discount***

30.     The Defendants' business model exploits the tacking provision of Rule 144[9] by

---

[9]  SEC Rule 144, was adopted to establish criteria for determining whether a person was engaged in the distribution of securities.  One condition under Rule 144 is that the selling security holder must have held the security for a

holding only the promissory notes (which are payable absolutely and carries no investment risk) for six months.  Upon conversion of the notes into stock, Defendants do not assume any economic risks of stock ownership.  Instead, they immediately sell the stock to reap the spread between the discount and the market price.  The value of the conversion discount at the time of entering into these transactions is interest under New York law.

31.     Upon information and belief, Defendants time their conversions and sales in an effort to comply with the holding period under Rule 144.  For that reason, Defendants generally wait either six months (the minimum Rule 144 holding period for securities issued by SEC-reporting companies) or one year (the minimum Rule 144 holding period for securities issued by non-SEC-reporting companies) after purchasing a convertible note, before they began to convert the note into newly-issued stock and then sell that stock into the public market.

32.     The convertible notes that Defendants purchased and/or solicited from public companies have allowed them to acquire no fewer than **1,249,107,204 shares** of newly-issued stock at a substantial discount — typically around 20 percent below the lowest trading price for the issuer's common stock during the "valuation period" of 20 trading days preceding the date of the conversion request.

33.     Upon information and belief, after holding the convertible debt acquired through convertible note transactions for the applicable holding period contained in Rule 144, Defendants send conversion notices to the issuers and their transfer agents, identifying the amount to be converted and the corresponding shares to be issued to Defendants.

---

specified period of time (six months in this case) prior to resale into the market. This condition helps ensure that the holder who claims an exemption has assumed the full economic risks of ownership, and is therefore not acting as an underwriter.  Rule 144 also permits "tacking" of the six-month holding period; if a security holder simply exchanges a previously-purchased security for a different security of the same issuer (such as with conversion), the newly-acquired security is deemed to have the same purchase date as the original security.  If the holding period has expired, the new security may be sold immediately.

34.     Upon information and belief, instead of converting all of the debt into stock all at once, Defendants usually send multiple conversion notices for each convertible note.  Upon information and belief, among other reasons, Defendants incrementally convert debt into stock and sell said stock over a period of time to purposefully avoid owning more than five percent of any class of an issuer's publicly traded stock at any one time.  Far from an investment strategy, such incremental conversions and sales are timed for the purpose of evading  the requirement to file a "beneficial ownership report" with the SEC (*i.e.*, Schedule 13D and Schedule 13G).  *See* 17 CFR § 240.13d-1.

35.     Upon information and belief, Defendants arrange for the converted stock to be transferred to their brokerage accounts as quickly as possible to ensure maximum profits and to capitalize on the conversion discount, often paying expediting fees to further reduce the time for this to occur.

36.     Upon information and belief, as part of their business model, Defendants obtain suspect attorney opinion letters that, at minimum, provide false assurances to brokerage firms that the converted stock is not restricted and may be resold to the public.

### *Defendants Sell the Converted Stock Into the Public Market*

37.     Upon information and belief, once brokers deposit the converted shares from the issuers into the Defendants' brokerage accounts, the Defendants generally begin selling the shares into the public marketplace immediately to lock in their profits.

38.     Upon information and belief, the Individual Defendants personally, or through an affiliated person, entity, or independent contractor acting at their direction, use the telephone and the internet to place sell orders.  Sales are made through brokers.

39.     Upon information and belief, Defendants generally sell only as much as the market

will bear, often staggering sales over a short period of time instead of all at once.

40.     Upon information and belief, Defendants' practice is to sell the shares they have acquired in a conversion continuously on a daily or near-daily basis until they have sold all of their shares into the market.

### Defendants Earn Significant Profits From
### Selling Discounted Shares of Stock

41.     Upon information and belief, Defendants reap large profits from their unregistered dealer activity, the majority of which results from reaping the difference between the market prices they receive when they sell the stock to the public, and the deeply-discounted prices at which they acquire shares from the issuers, rather than from any appreciation in the stock's price.   This mechanism, which provides Defendants with a spread or markup on the stock that they sell, is a common practice among securities dealers.

42.     Since 2014, Defendants have purchased numerous convertible promissory notes (securities) from multiple public companies and converted the same into no fewer than **1,249,107,204** shares of newly-issued stock which, upon information and belief, Defendants have subsequently sold into the public market for tens of millions of dollars.

43.     Upon information and belief, Defendants have generated millions of dollars in gross stock sale proceeds, with many other securities transactions still outstanding.   The majority of the net profits are from the spread between Defendants' discounted purchase price (per the terms of the applicable note) and the prevailing market pricing.

### Defendants Violate the Federal Securities
### Laws by Acting as Unregistered Dealers

44.     Upon information and belief, Blackbridge is not now, and has never been registered as a securities dealer with the Financial Industry Regulatory Authority ("FINRA").

45.     Blackbridge's purchases of convertible notes (securities transaction), conversions

of debt into stock (securities transaction), and subsequent stock sales (securities transaction) are part of an ongoing business for its own account.

46.     Blackbridge acquires large volumes of shares privately from issuers at a substantial discount to market, sells large volumes of shares back into the open market for substantial profit due to the conversion discount, and engages in these activities absent investment intent.

47.     Each time Blackbridge purchases a convertible note, converts debt into stock, or sells conversion stock, it effects a transaction in securities.

48.     As part of its regular business, Blackbridge acquires large amounts of shares directly from public companies at a substantial discount to market, sells large volumes of shares back into the open market for a substantial profit due to the conversion discount, and does so for its own account absent investment intent.  Accordingly, Blackbridge buys securities, converts securities, and sells securities as part of its regular business for its own account.

49.     Upon information and belief, Blackbridge made use of the mails, email and other instrumentalities of interstate commerce to effect the Agreements and subsequent securities transactions.  For example, Blackbridge transferred cash through wire transfers, and used email and telephone communications to negotiate and effect purchases and sales.

50.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC, or, in the case of a natural person, associate with a registered dealer.  *See* 15 U.S.C. § 78o(a)(1).

51.     By failing to comply with the dealer registration requirements mandated by federal law, Blackbridge purposefully operates "under the radar" to avoid important legal and regulatory oversight by the SEC and FINRA.

52.     The dealer registration requirements provide important safeguards for the investing public, shareholders and public companies.  The excessive compensation and patently unfair terms in the Agreements (and upon information and belief, in Blackbridge's transactions with other issuers) would violate FINRA Rules 5110(b) and 5110(c)(2)(A), and thus could not be effected by an unregistered securities dealer.

53.     Blackbridge's outrageous profits from the Agreements result from the market prices it received when they sold the stock into the public market, and the steep discounted price at which it acquired the stock from Astra Veda.  This practice—through which Blackbridge reaps the profits on the spread or markup of the stock they sold—is a common behavior of a securities dealer or underwriter.

54.     Registration as a securities dealer and accompanying SEC oversight would further prevent Blackbridge from utilizing the Rule 144 tacking provision (17 C.F.R. 230.144(d)(3)(ii)) because Blackbridge's business operations constitute underwriting activity, or sales with a view to distribution.

55.     Operating as an underwriter requires dealer registration.

56.     As a part of its regular business, Blackbridge obtains newly-issued stock directly from microcap issuers through note conversions -- as opposed to purchasing stock in the open market.

57.     The convertible securities that Blackbridge purchases enable it to acquire millions of shares of newly-issued stock at a significant discount—typically about 20 percent of the trading price. As a regular part of its business, Blackbridge sells large blocks of such newly-issued shares into the public market—a common hallmark of a securities dealer.

58.     Upon information and belief, Blackbridge has used its business model to extract

millions of shares of stock from Plaintiff and other unwitting issuers.

### III.    DEFENDANTS' BUSINESS MODEL AS APPLIED TO PLAINTIFF

*Defendants Entered Into*
*Agreements That are Usurious and*
*Unenforceable Under New York Law*

59.    The Agreements state that they are governed by New York law.

60.    Pursuant to its typical business model, the Agreements provide Blackbridge with a conversion option, that is, an option to take repayment by exchanging the debt for shares of company stock.

61.    Consistent with its usual practice, Blackbridge would not exchange the debt on a dollar-for-dollar basis, but at a substantial discount to the market price at the time of conversion— in this case a 20% conversion discount.

62.    The New York Court of Appeals has recently concluded that for securities of this type, the value conveyed by the conversion discount must be included in the interest calculation for purposes of assessing compliance with the state's usury laws.[10]

63.    By charging through the Agreements more than double the maximum enforceable rate of interest, *see* 18 U.S.C. § 1961(6); N.Y. Penal Law § 190.40, the Defendants have engaged in the collections of unlawful debts as follows:  pursuant to the March 2016 Note, the Defendants collected/charged a **121.25%**[11] A.P.R. interest rate based on the Loan of $200,000.00.

64.    The Agreements create an unlawful debt under RICO because the terms were imposed by Blackbridge, which is in the business of lending money at an interest rate substantially in excess of the maximum lawful rate.  Under the Agreements, Astra Veda was obligated to repay

---

[10]  *Adar Bays*, 179 N.E.3d at 614-15.
[11]  Calculated as follows:  Step 1: 20/80 = .25 (Conversion Discount); Step 2: ($500 default charges X 365 Days)/$200,000 = .9125 or 91.25% (Default Interest); Step 3: .25 (Conversion Discount) + 5% A.P.R (Stated Interest) + 91.25% (Default Interest) = **Total 121.25% A.P.R. Interest Rate.**

the money loaned, either in cash or in stock.

65.   As consideration for the loan of $200,000.00, Astra Veda relinquished $397,914.47 worth of cash and stock, a 55.2% gain for Blackbridge on an annualized basis.

66.   As demonstrated by the Agreements, and the additional transactions with other issuers alleged above—which are a part of Blackbridge's regular business—the Defendants are engaged in the business of lending money.

67.   Pursuant to New York's usury laws, the maximum enforceable rate for a loan to a corporation is 25% per annum.  *See* N.Y. Penal Law § 190.40.

68.   The fixed conversion discount, such as the ones provided to the Defendants in the Agreements, is interest that must be considered when calculating the true interest rate for usury analysis.[12]

69.   The Agreements reserved and imposed a stated interest rate of **5%** per annum; a **20%** discount floating conversion rate, and default charges of **91.25%** resulting in a **121.25% APR total interest rate.**, *which is at least 4.85 times greater than the maximum enforceable rate* permitted by New York's criminal usury law.

### Defendants Converted the Note
### (Security) to Stock (Also Securities)

70.   In this case, starting on May 8, 2017, Blackbridge submitted *five separate conversions* under the Note, pursuant to which Blackbridge received *504,775,865 newly-issued Astra Veda securities* (the "Related Transactions").

71.   Each of the five conversions is a separate securities transaction.

72.   Pursuant to those five conversions, Blackbridge converted the entire $200,000.00 principal and $19,805.20 in interest.  The open market value of the *504,775,865* newly-issued

---

[12] *See Adar Bays, LLC v GeneSYS ID, Inc.,* 179 N.E.3d 612 (N.Y. 2021).

Astra Veda securities received by Blackbridge pursuant to the conversions is approximately $397,914.47. Blackbridge's discounted value of the *504,775,865* newly-issued Astra Veda securities received is approximately $178,109.27. Therefore, Blackbridge's profit from the Notices of Conversion is approximately **$178,109.27**.

73.     As mentioned above, Defendants timed their conversions and sales in an effort to comply with the holding period under Rule 144 and thereby began converting almost immediately after the expiration of the holding period as follows.  Pursuant to the March 11, 2016 Note:

a.  On May 8, 2017, a conversion notice was submitted requesting issuance of 6,009,615 shares for the satisfaction of $25,000.00 of debt.

b.  On July 24, 2017, a conversion notice was submitted requesting issuance of 15,000,000 shares for the satisfaction of  $24,000.00 of debt.

c.  On October 5, 2017, a conversion notice was submitted requesting issuance of 14,800,000 shares for the satisfaction of $4,736.00 of debt.

d.  On May 17, 2018, a conversion notice was submitted requesting issuance of 200,000,000 shares for the satisfaction of $80,000.00 of debt.

e.  On June 27, 2018, a conversion notice was submitted requesting issuance of 268,966,250 shares for the satisfaction of $66,264.00 of debt, and $19,805.20 of interest.

74.     Each conversion of debt to stock identified in Paragraph 73 above constitutes an additional transaction in securities.

### *Defendants Continue to Convert and Sell Shares of Stock*

75.     Upon information and belief, Defendants continue to purchase new convertible notes, convert shares acquired in convertible debt transactions with counterparty penny stock

issuers, and then sell those shares into the market.  Upon information and belief, after waiting out the Rule 144 holding period, Defendants act in the same manner, converting and rapidly selling millions of newly-issued shares into the market for substantial profit.

76.     Defendants have sold stock that did not meet any of the exceptions from the definition of a "penny stock," as defined by Section 3(a)(51) of the Act and Rule 3a51-1 under the Act.  *See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51–1.

### *The Blackbridge Managers Control Blackbridge In its Convertible Debt Securities Business*

77.     At all relevant times, Dillon and Panait, as Blackbridge's sole managing members and dominant shareholders, directly possessed and exercised control over Blackbridge, including the power to decide whether to enter into agreements (including the Agreements in this case), to negotiate and approve the final deal terms, and to direct its sales of stock.

78.     Upon information and belief, Dillon and Panait negotiated the terms of the convertible notes that Blackbridge purchased from microcap companies (including Astra Veda), as well as any amendments to the original terms.

79.     Ultimately, Dillon and Panait were and still remain as the sole persons holding the power to direct, authorize, and compel Blackbridge indirectly through Blackbridge to enter into, convert, and subsequently sell securities through convertible notes with issuers, including the Note with Astra Veda.

80.     Dillon and Panait were and currently are the "controlling persons" within the meaning of Section 20(a) of the Act, with the power to cause Blackbridge to engage in unlawful conduct described herein.

***Astra Veda was Harmed by Blackbridge's***
***Unlawful Debt Collections***

81.     As a result of the unlawful debt collections, Astra Veda and its shareholders have been injured in its business and property.

82.     As a result of the unlawful debt collections, Blackbridge has obtained tens of millions of shares of free-trading Astra Veda common stock to which it was not entitled nor capable of lawfully receiving.

83.     The excessive conversions and resulting issuances have forced Astra Veda to increase its outstanding shares, thereby massively diluting Astra Veda's stockholders.

84.     Once Blackbridge began converting under the Agreements in this case, its immediate and massive selling of large blocks of newly-issued shares of Astra Veda's common stock into the public market caused enormous depressions in Astra Veda's market capitalization and stock price.

85.     As a result of these actions, Astra Veda has become unable to privately raise money from other entities, with other toxic lenders becoming the only reasonably available option for short-term financing, leading to more losses.

86.     As a direct and proximate result of the Defendants' unlawful debt collection and violations of 18 U.S.C. § 1962(c), Astra Veda has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased, its stock has been unlawfully acquired by the Defendants, and it has suffered further damage and injury to be determined at trial.

87.     All of the foregoing harm was foreseeable by Blackbridge, and was directly and proximately caused by Blackbridge's collections of unlawful debts as alleged herein.

## CAUSES OF ACTION

### COUNT I:

*Rescission Pursuant to § 29(b) of the Act for Violation
of § 15(a) of the Act by Blackbridge for Effecting (Making)
the Securities Contracts as an Unregistered Dealer*
(Against Defendant Blackbridge)

88.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of paragraphs

1 through 87 as though set forth herein.

89.    Section 29(b) of the Act provides in relevant part that:

*Every contract <u>made in violation</u> of any provision of this chapter or of any rule or
regulation thereunder ... shall be void* (1) as regards the rights of any person who,
in violation of any such provision, rule, or regulation, shall have made or …
engaged in the performance of any such contract**…**

15 U.S.C. § 78cc(b) (emphasis added).

90.    The Agreements were made in violation of Section 15(a) of the Act (15 U.S.C. §

78o(a)(1)), which prohibits unregistered dealers from using any means of interstate commerce to

effect transactions in securities.

91.    Blackbridge is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. §

78c(a)(5).

92.    Blackbridge is not registered as such with the SEC or any regulatory body, as

required by Section 15(a) of the Act.  15 U.S.C. § 78o(a)(1)).

93.    Blackbridge effected transactions in securities in the Agreements and in the Related

Transactions.

94.    Blackbridge used the means of interstate commerce to effectuate the Agreements

and the Related Transactions.

95.    As a party to the Agreements and the Related Transactions, Astra Veda is in

contract privity with Blackbridge.

96.     The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, Astra Veda, a stock issuer, is in the class of persons that the Act was designed to protect.  *See Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982).

97.     Because Blackbridge effected the Agreements in this case as an unregistered dealer, and utilized the means of interstate commerce in connection therewith, the Agreements were unlawful when made.

### COUNT II:

*Rescission Pursuant to § 29(b) of the Act for*
*Violation of § 15(a) the Act by Unlawfully*
*Transacting in Securities Via Performance of the*
*Securities Contracts as an Unregistered Dealer*
(Against Defendant Blackbridge)

98.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1 through 96 as though set forth herein.

99.     Section 29(b) of the Act provides in relevant part that:

*Every contract ...* (including any contract for listing a security on an exchange) heretofore or hereafter made, <u>*the performance of which*</u> *involves the violation of*, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, *shall be void* (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or  … engaged in the performance of any such contract… *Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, … shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made … any such contract…*

15 U.S.C. § 78cc(b) (emphasis added).

100.    The Agreements were performed in violation of Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)), which prohibits unregistered dealers from using any means of interstate commerce to effect transactions in securities.

101.     Blackbridge is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

102.     Blackbridge is not registered as a dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act, 15 U.S.C. § 78o(a)(1).

103.     Blackbridge affected transactions in securities in the Agreements.

104.     Blackbridge used the means of interstate commerce to effectuate the Agreements.

105.     As a party to the Agreements, Astra Veda is in contractual privity with Blackbridge.

106.     The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, Astra Veda, as an issuer, is within the class of persons that the Act was designed to protect.

107.     Because Blackbridge effected the Agreements and the Related Transactions as an unregistered dealer, and utilized the means of interstate commerce in connection therewith, the Agreements were unlawful when performed via the conversions.

### COUNT III:

*Violation of Section 20(a) of the Act by Dillon and Panait*
*as Control Persons of Blackbridge Based on Blackbridge's*
*Transactions in Securities as an Unregistered Dealer*
(Against Defendants Dillon and Panait)

108.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1 through 107 as though set forth herein.

109.     During the relevant period, Dillon and Panait were the persons who owned and controlled Blackbridge as the Blackbridge Managers, who solely control, direct, and authorize Blackbridge in its business practice of engaging with issuers.

110.     Dillon and Panait had the power and authority to cause Blackbridge to engage in the wrongful conduct described in Counts I and II herein.

111.    Dillon and Panait did in fact cause Blackbridge to engage in the wrongful conduct alleged in Counts I and II herein.

112.    Dillon and Panait did not act in good faith.

113.    At the time of the execution of the Agreements, Dillon and Panait knew that Blackbridge was not registered as a dealer with the SEC.

114.    Dillon and Panait directly and/or indirectly induced the acts and conduct that constitute the violations in this case.

115.    Therefore, Dillon and Panait each acted as a control person of Blackbridge within the meaning of § 20(a) of the Act (15 U.S.C. § 78t).

### COUNT IV:

*Conducting the Affairs of the*
*RICO Enterprise (RICO, § 1962(c))*
(Against All Defendants)

116.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1 through 115 as though set forth herein.

117.    Each of the two Blackbridge Managers is a RICO culpable "person" within the meaning of 18 U.S.C. § 1961(3):  an individual capable of holding a legal or beneficial interest in property.

118.    Blackbridge is a RICO "enterprise" within the meaning of 18 U.S.C. § 1962(c).

119.    The Blackbridge Managers agreed to and did conduct and participate in the conduct of Blackbridge's affairs through the collection of an unlawful debt from Astra Veda, specifically, by collecting and attempting to collect debt unenforceable under New York usury laws, having been incurred by loans by the enterprise that charge, take or receive interest at more than double the maximum enforceable legal rate.

120.    Upon information and belief, pursuant to and in furtherance of their scheme, Blackbridge is in the business of making loans at usurious interest rates, and thereby committed multiple related acts of unlawful debt collection from a plethora of other needy microcap companies throughout the country.

121.    The Blackbridge Managers have directly and indirectly conducted and participated in the conduct of Blackbridge's affairs through the collections of unlawful debts described above, in violation of 18 U.S.C. 1962(c).

122.    The activities of Blackbridge, which, *inter alia,* lends money to corporations nationwide, affect interstate commerce.

123.    As a direct and proximate result of the Defendants' unlawful debt collection and violations of 18 U.S.C. § 1962(c), Astra Veda has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased, its stock has been unlawfully acquired by the Defendants, and it has suffered further damage and injury to be determined at trial.

### COUNT V:

*Conspiracy to Collect an Unlawful Debt*
*Under RICO (18 U.S.C. § 1962(d))*
(Against Defendants Alexander Dillon and Cosmin Panait)

124.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-123 as though set forth herein.

125.    Upon information and belief, Defendants Alexander Dillon and Cosmin Panait intentionally agreed and conspired to, by and through their agents and/or on behalf themselves as individuals, to conduct and participate in the affairs of the enterprise by engaging in the business of collecting unlawful debts from financially struggling public companies, including Astra Veda.

126.    Upon information and belief, Defendants Alexander Dillon and Cosmin Panait knew that their predicate acts were part of the collection of unlawful debts and nonetheless agreed to the commission of those acts to further the schemes described above.  Such conduct constitutes a conspiracy to violate 18 U.S.C. § 1962 (c) in violation of 18 U.S.C. § 1962(d).

127.    As a direct and proximate result of the foregoing conspiracy, the overt acts taken in furtherance of that conspiracy, and the violations of 18 U.S.C. § 1962(d), Astra Veda has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased, its stock has been unlawfully acquired by the Defendants, and it has suffered further damage and injury to be determined at trial.

**COUNT VI:**

*Unjust Enrichment*
(Against All Defendants)

128.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-127 as though set forth herein.

129.    The Defendants have received valuable benefits from Astra Veda, including, *inter alia*, the stock and profits realized from the sale of the unlawfully issued shares of Astra Veda common stock.

130.    These benefits are the result of the wrongful conduct alleged in Counts I-V herein.

131.    By engaging in the securities transactions alleged herein, Defendants violated the federal securities laws.

132.    By charging Astra Veda an effective interest rate in excess of 25% A.P.R., Defendants violated Section 190.40 of the New York Penal Code, a class E felony.

133.    By collecting unlawful debts from Astra Veda in excess of twice the maximum enforceable rate, and by conspiring to do so, Defendants violated RICO, 18 U.S.C. § 1962 (c) and

(d).

134.   The Defendants have unjustly retained the benefits of having violated the federal securities laws, and RICO at the expense of Astra Veda and its stockholders.

135.   As a result of the foregoing, the Defendants have been unjustly enriched.

### COUNT VII:

*Constructive Trust*
(Against All Defendants)

136.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-135 as though set forth herein.

137.   As alleged in Count VI herein, the Defendants have been unjustly enriched by Astra Veda.

138.   The circumstances are such that it would be fundamentally unjust and inequitable for the Defendants to retain the property conferred on them by Astra Veda.

139.   Astra Veda has a specific, identifiable interest in the property unjustly retained by the Defendants as a result of the Agreements.

140.   The Defendants have wrongfully acquired, and detained Astra Veda's property obtained via the Agreements.

141.   Allowing the Defendants to retain the property conferred on them by Astra Veda would inequitably allow the Defendants to profit from their own wrongdoing, and to dispose of said property for their own purposes including without limitation paying their attorney's fees and costs in connection with this action, and engaging in additional unlawful transactions of the type giving rise to this action.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Astra Veda seeks a Verdict and Judgment against the

Defendants herein as follows:

A.   Count I (Against Defendant Blackbridge)

    a.   Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Astra Veda requests the Court to declare that:

        i.   the Agreements are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

        ii.   Blackbridge is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

        iii.   the Agreements are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

        iv.   Blackbridge is entitled to retain the principal amount of the loans made pursuant to Agreements, already repaid by Astra Veda.

    b.   Astra Veda requests that the Court enter an Order:

        i.   rescinding the Agreements pursuant to the Act (15 U.S.C. § 78cc);

        ii.   awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

        iii.   requiring Blackbridge to return to Astra Veda all Astra Veda stock obtained via the Agreements; and

        iv.   awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

B.   Count II (Against Defendant Blackbridge)

    a.   Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Astra Veda

requests the Court to declare that:

    i.    the Agreements are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

    ii.    Blackbridge is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

    iii.    the Agreements are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

    iv.    Blackbridge is entitled to retain the principal amount of the loans made pursuant to Agreements, already repaid by Astra Veda.

b.   Astra Veda requests that the Court enter an Order:

    i.    rescinding the Agreements pursuant to the Act (15 U.S.C. § 78cc);

    ii.    awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

    iii.    requiring Blackbridge to return to Astra Veda all Astra Veda stock obtained via the Agreements; and

    iv.    awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

C.    Count III (Against Defendants Dillon and Panait)

a.   Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Astra Veda requests the Court to declare that:

    i.    Dillon and Panait had the power and authority to cause Blackbridge to engage in the wrongful conduct described in Counts I and II herein;

    ii.     Dillon and Panait did in fact cause Blackbridge to engage in the wrongful conduct described in Counts I and II herein; and

    iii.    Dillon and Panait acted as the controlling persons of Blackbridge within the meaning of Section 20(a) of the Act (15 U.S.C. § 78t(a)).

b.    Astra Veda requests that the Court enter an Order, pursuant to Section 20(a) of the Act (15 U.S.C. § 78t(a)), holding Dillon and Panait jointly and severally liable with and to the same extent as Blackbridge is liable to Astra Veda under Counts I and II herein.

D.    Count IV (Against All Defendants)

a.    Astra Veda requests that the Court enter a Judgment against all the Defendants as follows:

    i.     awarding Astra Veda compensatory, direct, and consequential damages;

    ii.    awarding Astra Veda treble damages as a remedy for the economic injury sustained by the Defendants' collections of unlawful debt;

    iii.    awarding Astra Veda its attorneys' fees and costs associated with this litigation;

    iv.    entering an award of monetary damages jointly and severally against the Defendants; and

    v.    awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

E.    Count V (Against Defendants Dillon and Panait)

a.    Astra Veda requests that the Court enter a Judgment against all the Defendants as follows:

    i.    awarding Astra Veda compensatory, direct, and consequential damages;

    ii.    awarding Astra Veda treble damages as a remedy for the economic injury sustained by the Defendants' collections of unlawful debt;

    iii.    awarding Astra Veda its attorneys' fees and costs associated with this litigation;

    iv.    entering an award of monetary damages jointly and severally against the Defendants; and

    v.    awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

F.    Count VI (Against All Defendants)

    a.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Astra Veda request that this Court declare that:

        i.    Defendants have voluntarily accepted and retained the property conferred by Astra Veda on the Defendants through and as a result of violations of the Act (15 U.S.C. § 78o); and

        ii.    the circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by Astra Veda without first paying the value thereof to Astra Veda, to prevent the Defendants from being unjustly enriched.

    b.    Astra Veda requests that this Court enter an Order requiring the Defendants to return to Astra Veda the value of the property they have unjustly retained in the amount of $397,914.47, less the value conferred upon Astra Veda.

G.    Count VII (Against All Defendants)

    a.   Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Astra Veda requests this Court to declare that:

        i.   Defendants have voluntarily accepted and retained the property conferred by Astra Veda on the Defendants through and as a result of violations of the Act (15 U.S.C. § 78o); and

        ii.   the circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by Astra Veda without first paying the value thereof to Astra Veda, to prevent the Defendants from being unjustly enriched.

    b.   Astra Veda requests that this Court enter an Order imposing a constructive trust *pendente lite* and permanently on Astra Veda property in possession of the Defendants as a result of the property conferred on them by Astra Veda.

H.   As to each of the foregoing Counts I-VII, to the extent permitted by applicable law, and not otherwise requested, Astra Veda requests that this Court enter an Order:

    a.   awarding Astra Veda compensatory, direct, and consequential damages;

    b.   awarding Astra Veda its attorneys' fees and costs associated with this litigation;

    c.   entering an award of monetary damages jointly and severally against the Defendants; and

    d.   awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues properly so tried.

DATED: May 10, 2022                    Respectfully submitted,

**THE BASILE LAW FIRM P.C.**

By:*/s/ Mark R. Basile, Esq.*_____
MARK R. BASILE, ESQ.
390 North Broadway, Suite 140
Jericho, NY 11753
Tel.:    (516) 455-1500
Fax:     (631) 498-0748
Email:  mark@thebasilelawfirm.com

***Attorneys for Plaintiff Astra Veda***
***Corporation***